IN THE UNTIED STATES DISTRICT

FOR THE SOUTHERN DISTRICT OF NEW YORK

Osman Ozsusamlar                ]

      Petitioner             ]     Case no: 10  civ. 3455 (JPO)

vs.                             ]

                            ]

                            ]     Related Case: 05 Cr. 1077 (PKL)

United States of America ]

                            ]

      Respondent            ]

------------------------------------------------

AFFIDAVIT OF OSMAN OZSUSAMLAR

  A.) I depose and state all the following all true and correct of my own free will,

  B.) I am over the age of 18 years old,

  C.) I am not on any mind altering drugs or medication,

    I, OSMAN OZSUSAMLAR, PURSUANT TO 28 U.S.C. SUB.SEC. 1746, AND DECLARE UNDER THE PENALTY OF PERJURY:

  1.) On January 6, 2006, I was indicted on the charges of (Count 1): Murder For Hire conspiracy-18 USC Section 1958; (Count 2): Murder For Hire-18 USC Section 1958(b); (Count 3): Extortion Conspiracy-18 USC Section 1951 (b) (3).

  2.) On or about January 6, 2006, I obtained Attorney Osuna.

  3.) On or about January 6, 2006, the Honorable Judge Cote

1

explained , on record, during the preliminaries, that Attorney Osuna would handle this case if his schedule did not conflict with his previous engagements. (trial date was set for April 10, 2006.)

4.) Mustafa Ozsusamlar, my father, is a co-defendant in this case.

5.) On or about March 19, 2006, Attorney Osuna came to me and stated that the judge in my case had been changed because, in his words, "Judge Cote is too strict and causes alot of trouble...and the new judge would be better...."

6.) On or about March 19, 2006, I wrote to Judge Cote a letter of objection. That what my attorney had stated as a reason for changing judges wasn't good enough for me.

7.) On or about March 23, 2006, my father and I were summoned to the court house and were informed that the Honorable Judge Leisure would preside over this matter. That Judge Cote was busy with other cases. To my understanding, this was very unfair towards me because the Trial was less than a month away. I believe that this action prejudiced my case.

8.) On or about March 30, Attorney Osuna filed Motions to have Forensic Tests done on recorded conversation that took place between myself and FBI agent Melvin Bailey. (See exhibit #2, pg. 16; also exhibits 2-a and 2-b of Defendants exhibits) Clearly it can be seen that the court granted the Motion of Attorney Osuna to have forensic tests done on the recorded conversations with myself and agent Bailey.

9.) On or about March 31, 2006, Attorney Osuna visited me at the MCC jail to have me sign my signature requesting the court

to pay for the forensic tests. Up until this point, I have not seen any of the evidence that this particular test has been done. Although I have requested such. Nor have any 3500 material given to me.

10.) On or about April 3, 2006, Attorney Osuna wrote a letter to Professional Audio Laboratories, to a one Mr. Paul Ginsberg, explaining what is to be done regarding the CD's. (See exhibit #3)

11.) Mr. Ginsberg responded to Attorney's Osuna's letter on April 5, 2006. (See exhibit #4)

12.) This process of verifying the authenticity of the recordings were and are very critical in this case. As Attorney Osuna stated, "Our expert could then testify that based on his expertise that he has found evidence of tampering or else the expert can tell us in my experience, I find no evidence of tampering." (See exhibit #5)

13.) On or about April 10, 2006, no forensic tests results were shown during my trial. Nor was the matter brought up. Also, No Witness List was ever produced to the court or Jury. (See exhibit #6)

14.) On or about June 2, 2006, Attorney Osuna sent a confirmation letter to the CJA office notifying them that Judge Leisure had signed an Order to pay the forensic company $2,600.00. It is believed that the forensic company did the job. That being the case, there is no evidence that the job was either verified, completed, or confirmed. Which is clear that Attorney Osuna neglected his responsibility to effectively perform his duty towards this case. (See exhibit #7)

15.) On February 23, 2007, the court brought me for sentencing but at that time, I did not have an attorney present. Thus, attorney Martine Beamon was appointed as my attorney for sentencing.

16.) On or about February 27, 2007, Attorney Beamon sent to me 3500 material. This is when I learned that Attorney Osuna had been granted the money to pay the forensic company for the tests. (See exhibit #8)

17.) On or about March 25, 2007, I contacted my brother Ramazan and friends Ihsan Askin, and requested of them to contact this forensic company to see if I could get a copy of the forensic results. Upon further investigation of this matter, the Company owner told them that they had never done any forensic analyzing in this case, dated April 2007.

18.) Mr. Paul Ginsberg made three (3) copies of a taped conversation I had with agent Bailey, off of one (1) tape/cd. According to court records, there are four (4) Cd's. Also, the one CD that Mr. Ginsberg used, although he made three (3) copies from the one CD, does not match any of the originals. (See exhibit #9)

19.) On or about April, 2006, Attorney Osuna gave me and my brothers four (4) CD's, one (1) Tape Cassette, and CD & Tape Transcripts. (See exhibits #11, #36, and #39 respectively) For the record, none of the CD's match.

20.) Sometime after finding out that there was contradictions in the recordings/transcripts, I asked of my attorney to have these discrepancies investigated. In particular, Attorney Osuna and attorney Rothman for what I deem as fraud or having known that a fraudulent action had

taken place either between themselves or the FBI, or the forensic company. This was to no avail.

21.) It is my belief that an extreme prejudice happened to me when I was sent to Florence Colorado's ADX lock-down unit based upon a Disciplinary Report given to me based upon a far-fetched allegation. Particularly, in accordance with 28 FCR sub.sec. 7.12. Retaliation for Exercising Constitutional Rights. (See exhibit #12)

22.) On or about April, 2007, inmate Michael Lair drafted a Motion and letter in reference to issues surrounding my case. (See exhibit #14). At that time, I am not sure of what the contents of the Motion/Letter consisted of because of my lack of command of the English language. As this inmate told me, it was in regards to 3500 material and results from the forensics company.

23.) On or about May 9, 2007, I was given a Disciplinary Report by MDC-Brooklyn employee(s) for threatening bodily harm to another. This accusation extending from a letter that I wrote to the Judge in my case and my attorney requesting documents. Somehow, this letter was taken to be a viable threat to Judge Leisure. (See exhibit #15 & #16) Thus, based upon this incident report, I was placed in the ADX facility in Florence, Co.

24.) To that mentioned above, there still has not been any conclusive evidence that I committed any crime in regards to the judge in my case or against the United States. I aver, that if there was a crime committed in my name, then it was done by inmate Michael Lair, of which I am partially the blame, in taking advantage of my evident deficiency of the

English language. (See exhibit #17)

25.) On or about May 1, 2007, court transcripts proved that the recording did not match what the Translator had been translating to me. Nor did it appear so with the court. Therefore, at that time, Attorney Rothman stated: "I spoke to Mr. Ginsberg and he did not make any forensic analyzations." Be mindful, that court transcripts does not show exactly what is said, but its still enough to prove that something transpired between some party(s) surrounding the forensic tests that the Judge ordered. As was proven, $2,600.00 was paid to the lab to carry-out the test. (See exhibits #18 & #7)

26.) On or about May 10, 2007, Attorney Rothman gave to me copies of a forensic result of "tapes" that were recorded of Agent Bailey and myself. (See exhibit #20) Attorney Rothman states in, which was given to me in letter form: "the results of the forensic examination of the tape recorded evidence in your case..." letting me know specifically that there are a Tape Recording and CD Recorded evidence in my case.

27.) Exhibit #19 proves that forensic tests were not done on three (3) of the audios. Meaning, at least three (3) tests are still pending.
If the question of innocence is hinged upon the forensic evidence provided in this case and the evidence is either tampered with or incomplete, then how can any proper sentence be fair without the facts being duly submitted and considered? Better, still, what person(s) would pay someone to do a job, having the job not complete, and doesn't complain? As can be seen in government exhibits 21, 22, 23, and 24, Judge Leisure

granted the "four" (4) voice analysis forensic tests.

28.) More baffling is the fact that in a letter from
Attorney Osuna, dated December 2, 2010, he states (and I
quote): "the recordings in question were not tapes." (See
Attorney Osuna's letter to Judge Richard J. Holwell - Exhibit
#1) Yet, again, the evidence produced within this affidavit
shows that tapes are indicated and shown. (See direct of Agent
Bailey, defendants exhibit 33, pg. 327, where it specifically
states that it was tapes that were given to Chris Petrellese,
etc.)

29.) These facts prove, beyond a shadow of doubt, that the
forensics were either done on another cassette or tape other
than what is being verified. Thus, the reason why there are
discrepancies of what is on the CD's in question as examined
by Mr. Ginsberg. To point out this discrepancy:

a.) There are four (4) different CD's dated 9/18/05, which
are: Bailey-3505-4 (MB); 3/28/06 date of transcript (exhibit
#21);

b.) Bailey-3505-22, which is supposed to be the same as
GX21-T of 4/5/06 transcript;

c.) On a FBI chart, it shows a CD titled 1D59 that started
at 8:46 p.m. with no end time, nor duration. (See exhibit
#24); and

d.) Under exhibit #9, CD's one (1)-9/18/05, 6:55 p.m.;
two (2)-9/18/05, 6:55 p.m.; and three (3)-196D-NY-290468-1NV6,
9/18/05, 6:55-8:46 p.m. It is with these particular CD's that
the discrepancy takes place. Although similar, not the same.
Which they should be the same because of the times and dates
being of the same occasion. Also, there are two (2) other CD's

7

on exhibit #9, reportedly from Professional Audio Labs, that
have different dates (9/30/05 & 10/6/05). CD dated 9/30/05 is
exactly like the transcript print-out. (See exhibit #24) CD
10/06/05 has diferrences in the transcript and whats actually
on the CD. Whereas on the transcript it shows a total of five
(5) calls. On the CD, it shows fourteen (14) calls. On the
five (5) calls there are no minutes used. Any purported calls
after the five has no reported conversations. Just time
periods mentioned showing Agent Bailey's attempts at trying to
reach me.

  30.) None of the above mentioned CD's or Tapes (if you
will), match in time or duration of time. Trial transcripts
show that CD's measured for account number 01.01.11 and
01.03.01. No time duration. The start time for the CD is
18:55:17 and goes to 20:46:25, approximately 111 minutes, 8
seconds. (See exhibit #27)
Attorney Osuna's CD starts at 6:55 p.m. and ends at 8:49 p.m.,
a total duration time of 114 minutes. Yet, supposedly, this is
the same transcript as Agent Bailey's. (See exhibit #11, 21,
and 25.)

  31.) Therefore, understandably, the record shows that what
was analyzed were the Tapes, not the CD's, as exhibits #20,
And Trial Transcripts show. (Tr. pg. 304-exhibit #26) Based
upon the above mentioned proofs, it is clear to me that
Attorney Osuna lied to me when he stated that it was a
digital recording, when evidence showed otherwise. Thus,
proving his neglect or wanton lack of concern for the best
possible outcome for his client. This was done, so I believe,
to hide the fact that the Tapes were tampered with.

Government's exhibit #24 shows, what I believe to be a "Claim of Custody/Evidence Form" made out by Agent McKeever of an Original Computer Disk (E026184070). You'll notice that the date (10/6/05) and time (8:55 p) is written on the claim form, but is not written on a CD but a Cassette Tape. (See exhibit #40a) This would lead any intelligent person to question what is truly being implied by the two (2) contradicting pieces of evidence (Tape Cassette, or Computer Disk?; Also, refer to Tr. Defendant's exhibit #33, where Mr. Bailey admits that it was a Tape Recording that was placed in evidence. Not a Computer Disk.)

32.) FBI surveillance CD recording starts at 6:57 p.m. and ends at 8:31 p.m.. Total duration time of 94 minutes. (See exhibit #28; FBI Agents McKeever and Linder report) Both of these reports are evidenced dated September 18, 2005, and these two voice recordings must have been tampered with by someone whom had access to them, or, switched because they do not match in originality.

33.) Trial Transcript pages 286-288 confirm that there was no chain of custody honored to protect the evidence. The proof of this claim is in the statement on direct from Bailey on pages 286-288, where he states that "...the original CD ROM is placed in an envelope. It's initialed and dated, sealed and placed into evidence." (Tr. pg. 286) Further on direct, AUSA Southwell asks Agent Bailey: "So, Agent Bailey, if you could just continue with this Government Exhibit 20." Agent Bailey answers: "Once the recording, body recording device would be downloaded, an original CD ROM--the date and the file number would be placed--it would be placed in the

9

envelope. It would be sealed and the date that it was actually
sealed, then the CD ROM, the original would be placed into
evidence. There would be other copies made." (Tr. pg. 287)
AUSA Southwell asks Agent Bailey: "Agent Bailey, just so we're
clear, you said it's sealed. Are you aware of how the CD came
out of that envelope?" Agent Bailey responds: "Yes. On March
30, 2006, I took the envelope out of evidence and unsealed it
in a different location." (Tr. pg. 288)
This statement by agent Bailey on cross begs at least two (2)
questions: 1.) If it was sealed, for the obvious reasons, why
would the agent unseal it? Particularly when there is no
witness to verify that he did not tamper with the evidence?
And 2.) Why does he make conflicting reports about the same
CD, one, he claims on March 28, 2006 (NOT March, 30, 2006),
and another on April 5, 2006, of the exact same recording?
(See exhibit #39, copy of CD transcript of Sept. 18, 2005.)
It is clear that something took place here on one of the days
in question. On whichever day that it was, who can verify that
the CD's were not tampered with? Especially since the days are
conflicting then on March 28, 2006, there was two (2) days,
according to expert witness Agent Bailey's testimony, to
tamper with the CD's (As he claims that he did not unseal the
evidence until March 30, 2006. But Marks March/April 30th and
5th respectively).
The fact that Agent Bailey broke the seal of the most crucial
evidence to this case and gives conflicting statements
surrounding it, is cause for a rehearing, at the least, to
remove any doubts accrued because of it.

34.) Another example that can be pointed out is the

Recording Transcripts of Agent Bailey and myself on the occasions in question. (Sept. 18, 2005) If you were to compare defendants transcript exhibit-15 (dated 3/28/06), with Government's exhibit-21-T (dated 4/5/06), you will see many discrepancies in every page. How is this possible? (Compare pages 2-22 of recording transcripts of Agent Bailey and Osman Ozsusamlar, Sept. 18, 2005. Defendant's copy and Governments copy.)

Once again, if there are incompatibilities in what truly was said in the most damaging evidence presented to bolster the Government's case, then on what grounds should a conviction stand?

I attest that throughout this entire case, there are too many discrepancies to allow a conviction to stand on evidence that is apparently and obviously defective in the least.

35.) As well, the testimony of Attorney Winston Lee and Agent Michael Linder is completely different from what has been translated on court audio/video recording.

36.) The recorded cellphone conversations. (See exhibit #24 - 9/30/05) My cellphone records (Exhibit #30) shows all outgoing and incoming calls made on the days at question. In particular, calls from Agent Bailey lasted either one (1) minute or fourteen (14) minutes in duration. If you look at the CD's in exhibit #24, they show a duration of five (5) minutes twenty-eight (28) seconds, and six (6) minutes one (1) second. Thus, once again, not matching the recordings.

37.) The second and the third CD recordings dated 10/6/05, shows FBI Agent Bailey calling on my cell-phone fourteen (14) times.

On this note, if you look at the calls Agent Bailey made there
is, yet again, discrepancies in what he saids and what
actually happened. On October 6, 2005, according to records,
Agent Bailey makes a call to my cellphone at 8:55 p.m. On that
same date, according to records of the calls and body tape, he
states that he met with me at 8:55 p.m. Also, according to
Agent Bailey's statement, he talked to me via Body Tape for
eight (8) minutes. How is this physically possible? That, as
an issue, needs to be cleared up. Either he called me, or he
talked to me face to face. (See exhibit #42)

38.) This fact pointed out above proves, beyond a shadow of
a doubt, that Attorney Osuna lied to the court, on record,
when he stated, "...each recording created one digital file.
The Government ordered that the recording could not be
tampered with as that would create a corruption in the file
and I believe, and FBI Agent Bailey confirmed to exhibit 29,
page 2." Simply put, the original body recording/tape, after
it was downloaded into a CD ROM, was a job done by P.A.L.'s
owner, whom had to delete what was originally on those
recordings. Not to mentioned what was intentionally left out
either by order or out of neglect. The fact being that none of
the three (3) CD's match. Each of these digital files are not
the same. There also was to be a Camera Recording pursuant to
Section 802 but there was none created.

39.) In light of the above stated facts, Attorney Osuna
either deliberately or neglectfully, damaged my defense
against the false accusations. He, being qualified to handle a
case of such a magnitude, fumbled in this case. He had at his
disposal all pertinent information that I now have that shows

inconsistencies. Whether he thought them to be unimportant or frivolous is besides the matter. He had a duty, under Strickland, to provide me with Effective Assistance of Counsel and he dreadfully failed in this case.

Another issue surrounding Attorney Osuna's mishaps is that upon agreement, we would call Zubi Gunther to the stand in my case as one who could refute certain evidence. Attorney Osuna tendered a written, signed statement from Mr. Gunther. But, for some unapparent reason, Attorney Osuna failed to call this witness--see Exhibit #35 (Zubi Gunther handwriting statement copies). Thus, prejudicing my case.

Further. Attorney Osuna created his own digital recording and admitted it as "Exhibit #1", after knowing the Court ordered that the evidence was not to be tampered with, because it would create a corruption. Why, in fact, did Attorney Osuna tamper with, in any fashion, the evidence in this case, is beyond my understanding. All I can say for sure is that it was done in direct insubordination of the Court's order. (See exhibit #1)

40.) The first and second page of "exhibit #20" states that the original CD recording was sealed and placed into evidence and that other copies would be made. Agent Bailey admitted that he took the "sealed" CD recording out of evidence, unsealed it in a different location, then signed and dated it two days prior to March 30, 2006. (Actually, March 28, 2006) Why? Because as he said on the record, "because I wanted to listen to it." Thus, the tapes ran the risk of being tampered with by Agent Bailey. And because theres that shadow of doubt, the evidence should not stand in this case.

41.) Ridvan Sezer. A co-defendant of cooperating witness Muhamed Mobrouk. There was no mention of Ridvan Sezer to the Jury in my trial. Also, there is no mention of Ridvan Sezer being used as a Turkish Translator in this case. (See exhibit #37) The question remains, why is he not on the Witness list for the Government? Although he was used as such by the Government. (See exhibit #37) Why was his name hidden? Only speculation can derive from this, but, reason would prevail to say that the reason why he wasn't used by the Government is that his credibility would have been in question. One, because he was a criminal in jail on another case with another criminal; and two, because he would have shown the inadequacies of the Government in proving a case against me.

42.) On October 2005, the FBOP was in cahoots with FBI Agent John F.Campanella, Agent Theresa K. McKeever,Agent Melvin Bailey, Agent Michael Linder, Agent Christopher Petrellese, Alexander Southwell, and Miriam Rocah, to orchestrate a hearing to use a wire device to record a conversation with me without a Court Order. (See exhibit #41)

43.) The overall damaging evidence in this matter is that, in my belief, my Attorney, the AUSA, the FBI, and the Professional Audio Laboratories were all part and parcel accountable for the fraudulent materials introduced in this case. The evidence and facts pointed out above prove this beyond a shadow of doubt. These are not just blanket accusations without any valid proofs.

I could go on an on with the discrepancies and incompatibilities in this matter but I am apprehensive in boring the Court or insulting its intelligence to see what has

been put before it. And that is, that there is something drastically wrong in this case. Just a cursory glance at the evidence presented would undoubtedly prove this.

At this stage, I would respectfully request that this Honorable Court, in the face of the overwhelming evidence provided herein, grant this petitioner a new trial or acquittal on the charges mentioned above. And that in the least, grant an Evidentiary Hearing in this matter.


Respectfully Submitted,


    THE FOREGOING IS TRUE AND THE BEST TO MY KNOWLEDGE AND BELIEF.

-----------------------------------------------------------

Osman Ozsusamlar, Pro-Se

Reg. no: 53271-054

USP-Atwater

P.O. Box 019001

Atwater, Ca. 95301

----------------------- NOTARY -------------------------

CERTIFICATION

    I certify that all the above is all true and correct under penalty of perjury, dated March 29, 2012, Notary , 28 U.S.C. 1746, in lieu of Notary.

OSMAN NURI OZSUSAMLAR

15

```
------------------------EXHIBIT INDEX----------------------
```

EXH- 1: Attorney Osuna letter copy dated of 12/2/2010.

EXH- 2: Dated of 3/23/2006 court transcript  pgs. 16 & !9
        copies.

EXH- 3: From Att. Osuna's letter dated of 4/3/2006 to P.A.L.
        copies.

EXH- 4: From P.A.L. letters dated of 4/5/2006, to att. Osuna.

EXH- 5: Dated of 3/23/2006, court transcript pgs. 9 copies.

EXH- 6: Trial witnesses list copies.

EXH- 7: From Att. Osuna's letter to CJA Office copies.

EXH- 8: Att. Beoman letter to me dated of 3/23/2006, copies.

EXH- 9: PAL names show CD's copies dated of 9/18/2005.

EXH-10: Att. Osuna's letter dated of 3/19/2007 copies.

EXH-11: Att. Osuna's gave to me & my brother CD's copies.

EXH-12: 28 FCR sec. 7.12 copies.

EXH-13: FBI watching my privacy mail without court order
        copies.

EXH-14: My letter is copies to judge/att. dated of 5/7/2007.

EXH-15: MDC-Brooklyn jail gave to me "shot" copy.

EXH-16: DHO sentence report copy.

EXH-17: Inmate M. Lair add handwriting crime proof copies.

EXH-18: Dated of 5/1/2007, court transcript pgs. 17 thru 22.

EXH-19: PAL forensic test dated shown paper copy.

EXH-20: Att. Rothman letter with forensic test full copy.

EXH-21: Record date of 9/18/05,transcript date 3/28/2006,show

EXH-22: Trial transcript pgs. 303 copy.

EXH-23: Gx-21T transcript dated of 4/5/2006, show.

EXH-24: FBI recording chart copy.

EXH-25: Dated of 9/18/2005 transcript  copies last page.

EXH-26: Trail transcript pg. 304, show tape count number..

EXH-27: Forensic test duration time show 111min. 8sec.

EXH-28: FBI surveillance team reports copies...

EXH-29: Trail transcript pgs. 286-288 copies.

EXH-30: Dated of 9/30/2005, my cell phone statement copy.

EXH-31: S.A.M. copy first page.

EXH-32: S.A.M. vacated copies...

EXH-33: SIS Bradford special holding me without
authorization.

EXH-34: ADX have & my CD's copies...

EXH-35: Inmate Zubi Gunther statement copies.

EXH-36: Government Exhibit-24 evidence copy.

EXH-37: Gx-20 evidence copy show Ridvan Sezer name..

EXH-38: Trail transcript pgs. show dated of 3/30/2006....

EXH-39: All transcript fist pages show stamped 3/28/06.

EXH-40: Gx all transcript show dated of 4/5/06 ...

EXH-41: 05 MAG 1699 sealed complain copy.

EXH-42: October6, 2005, record activity chart...

NEW YORK NY 100

03 DEC 2010 PM 3 T

$12.90.218

Osman Ozsusamlar DVD
USP - ADX Reg # 53271-054
Po Box 8500
Florence, CO 86226

Law Office Of Robert Osuna
11 Park Place Suite 600
New York, NY 10007

I am received social more
12/01/2010

status

Law Office of Robert Osuna, PC
11 Park Place, Suite 600
New York, NY 10007
212.233.1033
646.201.4495 facsimile
osunalaw@aol.com

VIA FACSIMILE

December 2, 2010

Honorable Judge Richard J. Holwell
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *United States v. Osman Ozsusamlar, 10 CV 3455 (RJH)*

Dear Judge Holwell,

I tried to file this document via ECF but I am not a party to the action. I received in the mail as per Your Honor's Order a letter sent by my former client, Osman Ozsusamlar. I did not receive any of the exhibits mentioned in the letter. Mr. Ozsusamlar alleges "money corrupted with Agent Melvin Bailey, attorney Robert Osuna, attorney Franklin Rothman, Professional Audio Labs, Inc. owner Paul Ginsberg." (sic) Essentially the former client is alleging that expert services which were paid at Court expense were in fact never delivered.

To my knowledge, there is no truth to that allegation. The recordings in question were not tapes. In a pre trial conference, the defense questioned the validity of the recordings. The prosecutors alleged the recordings were not tapes but were digital recordings which were sent directly to a hard drive. Each recording created one digital file. The Government averred that the recording could not be tampered with as that would create a corruption in the file. Stopping and starting the recordings in between the conversations would create not one file, but two separate files.

We requested the Court appoint a recordings expert for the defense and that request was granted.

According to my records, the company used was Professional Audio Labs Inc., 311 Chelsea Manor, Park Ridge, NJ 07646. I located the company through an internet search. I sent the company a copy of the CD's provided to me by the Government. I spoke to the Chief Engineer at the Company who I believe was Mr. Ginsberg. In a telephone conversation he confirmed for me that the recordings were in fact legitimate

and he could find no basis to allege otherwise. He confirmed to me the accuracy of what the Government alleged (each recording created one digital file and the recording could not be edited without creating a new digital file). I conveyed the findings to my former client.

If a written report of the findings was made, it was given to the defense attorney who replaced me after I was relieved. I have had no reason to doubt that the engineer performed the services for which he billed. I was not present when the engineer made his analysis, of course. However, he did explain in detail to me the recording process and how these types of digital recordings are made. Based on my conversation with the engineer I had no reason to disbelieve him when he stated he made an analysis and found the recordings to be tamper free.

I am not aware of any statements made by Attorney Rothman or any conversations between Mr. Rothman and anyone at Professional Audio Labs. I was not privy to those conversations nor do I have knowledge if they occurred. For my part, I requested the use of an expert. The request was granted. I sent the materials to the expert who gave me his expert opinion. That opinion was not good for the defense but it was nonetheless given. That fact was conveyed to my former client. I had no reason to doubt the veracity of the expert when he gave me his expert opinion. Nor did I have reason to believe that he made no expert analysis at all and was simply lying to me completely.

Thank you.

Sincerely,

Law Office of Robert Osuna, PC
By:     Robert Osuna, Esq.


CC:     Osman Ozsusamlar, By Regular Mail
        USP-ADX
        Reg. # 53271-054
        P.O. Box 8500
        Florence, CO 86226

        United States Attorney
        Southern District of New York
        1 Saint Andrews Plaza
        New York, NY 10007

63NSOZSUSAMLAR

1          MR. OSUNA:  Your Honor, I spoke to an expert.  The

2     cost is approximately $2600 per CD ROM.  I believe that would

3     be a grand total of 4, which is a cost my client can't bear at

4     this time.  We are not asking to adjourn the trial.  He says he

5     has a turnaround time of one day per CD.

6          THE COURT:  You have done what I hoped you would,

7     which pleases me, and as far as reimbursement to the expert I

8     will sign the CJA authorization so that we can move ahead.

9          I see, you are retained counsel.  We don't have CJA

10     counsel.  It makes it complicated.

11          Have we gone through with Judge Cote a consideration

12     of CJA payment?

13          MR. TURNER:  We are not asking for appointment to CJA.

14     We are saying that our clients have spent their money,

15     especially Mr. Osman Ozsusamlar and he is asking the court

16     because he has no more money to help in his defense that the

17     court just pay for that expert, not -- the attorneys are

18     retained but because he does not have the money to pay for an

19     expert we are asking for the court's help.

20          THE COURT:  I haven't had this happen before but it

21     may be that counsel looking into it finds that it's appropriate

22     to ask for reimbursement for the expert where the money is not

23     there.  I don't want to suggest what we do unless it can be

24     done, so that counsel should talk to the prosecutor.  The

25     prosecutor's office has more experience in these things than I

1      MR. OSUNA: Just to be sure, then, the government has

2   no objection to us filing the necessary affidavit to have the

3   expert paid for then, is that correct?

4      MS. ROCAH: Correct, your Honor.

5      THE COURT: Unless someone brings it to my attention

6   that it's beyond my ability to rule with respect to such

7   payments, we will proceed and it's really between the defense

8   counsel and the court, so that we will proceed with that as

9   long as I know what the costs are in advance.

10      MR. TURNER:  I was handed a motion by the assistant

11   today as we walked into court.  Today was the date they were

12   supposed to file the motions and I gave them the motion timely.

13   It's a 404(b) motion and I want to answer this because I feel

14   that it is extremely prejudicial to my client and I think the

15   prejudice outweighs the probative value of any prior bad act.

16      THE COURT:  Do it in writing.

17      MR. TURNER:  I will.

18      What was the date that your Honor gave us to respond?

19      THE COURT:  Here is my order dated March 16.  I will

20   read it off the record to you.  It's March 29.

21      MR. TURNER:  I had forgotten at the moment because I

22   don't have it with me.  I do remember now.

23      I would like to ask the court if you would extend that

24   time since I am going to be away until the 4th of April.

25      THE COURT:  The problem with that is that I have to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**LAW OFFICE OF ROBERT OSUNA, P.C.**

11 Park Place Suite 600
New York New York 10007
(212) 233 1033
Fax (212) 233 1014

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/3/06

**MEMO ENDORSED**

March 30, 2006

The Honorable Peter K. Leisure
United States District Court
Southern District of New York
500 Pearl Street, Room 1910
New York, NY 10007

Re:  *United States v. Mustafa Ozsusamlar, et al (S1 05 Cr. 1077 PKL)*
     *Request for Audio Expert*

Dear Judge Leisure,

As was discussed in the last conference, my client requires an expert review certain of the audio recordings in this case. However, Mr. Ozsusamlar is without funds to retain an expert. The Court stated it would permit our expert to be paid from CJA funds so long as the amount were provided to the court.

We have contacted Mr. Paul Ginsberg of Professional Audio Laboratories, Inc. (Proaudiolab.com) and he has agreed to review the recordings at an hourly rate of $325.00. We expect the final cost to be no more than $4000.00. Mr. Ginsberg has testified at over 1700 trials and in 28 separate Federal Districts. He has over 30 years experience and is a well-respected expert in the field of audio technology.

Immediately upon the Court's approval, we will forward the necessary recordings to Mr. Ginsberg.

I thank the Court for its consideration in this matter.

*CJA funds are limited to a maximum of $4,000.00. Any additional funds will only be granted upon application.*

Sincerely,

/s/
Law Office of Robert Osuna, P.C.
By: Robert Osuna, Esq.

*Peter K. Leisure*
So Ordered: Hon. Peter K. Leisure

**DEFENDANT'S EXHIBIT**
42-e

CJA 21 AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES (Rev. 5/99)

| 1. CIR./DIST./DIV. CODE | 2. PERSON REPRESENTED | | VOUCHER NUMBER |
|---|---|---|---|
| District | Osman Ozsusamlar | | |

| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|
| | 05 Cr. 1077 (PLK) | | |

| 7. IN CASE/MATTER OF (Case Name) | 8. PAYMENT CATEGORY | 9. TYPE PERSON REPRESENTED | 10. REPRESENTATION TYPE (See Instructions) |
|---|---|---|---|
| USA v. Osman Ozsosamlar | X Felony ☐ Petty Offense<br>☐ Misdemeanor ☐ Other<br>☐ Appeal | X Adult Defendant ☐ Appellant<br>☐ Juvenile Defendant ☐ Appellee<br>☐ Other | C.C. |

11. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) If more than one offense, list (up to five) major offenses charged, according to severity of offense.
18 USC 1958

## REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

12. ATTORNEY'S STATEMENT

As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:

☒ Authorization to obtain the service. Estimated Compensation and Expenses: $ 4000.00 OR

☐ Approval of services already obtained to be paid for by the United States pursuant to the Criminal Justice Act. (Note: Prior authorization should be obtained for services in excess of $300, excluding expenses)

Signature of Attorney _____ Date 3·31·06

☐ Panel Attorney X Retained Attorney ☐ Pro-Se ☐ Legal Organization

ATTORNEY'S NAME (First Name, M.I., Last Name, including any suffix), AND MAILING ADDRESS
Robert Osuna, 11 Park Place, Ste 600, NY, NY 10007

13. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See Instructions)
Audio Expert to review recordings

Forensic examination of audio recording

| 14. TYPE OF SERVICE PROVIDER | | |
|---|---|---|
| 01 ☐ Investigator | 15 ☐ Other Medical |
| 02 ☐ Interpreter/Translator | 16 ☐ Voice/Audio Analyst |
| 03 ☐ Psychologist | 17 ☐ Hair/Fiber Expert |
| 04 ☐ Psychiatrist | 18 ☐ Computer (Hardware/ Software/Systems) |
| 05 ☐ Polygraph | |
| 06 ☐ Documents Examiner | 19 ☐ Paralegal Services |
| 07 ☐ Fingerprint Analyst | 20 ☐ Legal Analyst/Consultant |
| 08 ☐ Accountant | 21 ☐ Jury Consultant |
| 09 ☐ CALR (Westlaw/Lexis, etc.) | 22 ☐ Mitigation Specialist |
| 10 ☐ Chemist/Toxicologist | 23 ☐ Duplication Services (See Instructions) |
| 11 ☐ Ballistics | |
| 13 ☐ Weapons/Firearms/Explosive Expert | 24 X Other (Specify) |
| 14 ☐ Pathologist/Medical Examiner | Audio |

15. COURT ORDER

Financial eligibility of the person represented having been established to the Court's satisfaction, the authorization requested in Item 12 is hereby granted.

Signature of Presiding Judicial Officer or By Order of the Court
3/31/06

Date of Order _____ Nunc Pro Tunc Date _____
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES ☐ NO

| CLAIM FOR SERVICES AND EXPENSES | | FOR COURT USE ONLY | |
|---|---|---|---|
| 16. SERVICES AND EXPENSES (Attach itemization of services with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
| a. Compensation | $ 2600 | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |
| GRAND TOTALS (CLAIMED AND ADJUSTED): | $ 2600 | | |

17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix), AND MAILING ADDRESS
Professional Audio Lab Inc.
311 Chelsea Manor
Park Ridge, NJ. 07656

TIN: 13-2821968

Telephone Number: 201-664-8333

CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM April 4 TO April 5

CLAIM STATUS ☒ Final Payment ☐ Interim Payment Number _____ ☐ Supplemental Payment

I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee _____ Date 4/5/06

18. CERTIFICATION OF ATTORNEY I hereby certify that the services were rendered for this case.

Signature of Attorney _____ Date _____

## APPROVED FOR PAYMENT — COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOTAL AMOUNT APPROVED/CERTIFIED |
|---|---|---|---|
| | | | |

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained.
☐ Prior authorization was not obtained, but in the interest of justice the Court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

Signature of Presiding Judicial Officer _____ Date _____ Judge/Mag. Judge Code _____

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|
| | | | |

28. PAYMENT APPROVED IN EXCESS OF THE STATUTORY THRESHOLD UNDER 18 U.S.C. § 3006A(e)(3)

Signature of Chief Judge, Court of Appeals (or Delegate) _____ Date _____ Judge Code _____

LAW OFFICE OF ROBERT OSUNA, P.C.

**FEDERAL EXPRESS**

June 13, 2006

Paul Ginsberg
Professional Audio Laboratories
311 Chelsea Manor
Park Ridge, NJ 07656

Re:     United States v. Osman Ozsusamlar

Dear Mr. Ginsberg,

    Enclosed please find the CD F Bird recording we need analyzed. I confirmed with USDC Judge Leisure's chambers that the Order assigning you as an expert has been signed and will be available online perhaps this afternoon. I send this CD now, as I cannot wait until the Order is online.

    Should you have any doubts, please call Mr. John Enright, law clerk to Judge Leisure at 212.805.0227. I also enclose a Federal Express return Airbill with my account number already filled in. Our trial begins next Monday.

    Should you have any questions, please do not hesitate to contact the undersigned. Thank you for your attention to this matter.

Sincerely,

Law Office of Robert Osuna, P.C.
By:   Robert Osuna, Esq.

*his # is
(201) 746-
0675*

# PROFESSIONAL AUDIO LABORATORIES

**311 Chelsea Manor**
**Park Ridge, NJ 07656**

*PAUL GINSBERG*
*PRESIDENT*

*www.proaudiolabs.com*

*(201) 664-8333*
*fax (201) 746-0695*

April 5, 2006

Mr. Robert Osuna, P.C.
11 Park Place, Suite 600
New York, NY 10007

Re:   United States v. Osman Ozsusamlar

Dear Mr. Osuna,

Enclosed you will find the CD submitted for examination and enhancement, as well as 3 digitally enhanced CD's.

Initially I downloaded the recording into a state-of-the-art digital examination and enhancement system. I then proceeded to examine the recording for authenticity and continuity. The recording was observed to be 111 minutes in length, and recorded in stereo.

Following the examination, after considerable experimentation to maximize intelligibility, I generated a digitally enhanced file. Three enhanced CD's were then produced in WAV file format. The CD's are compatible with PC computers and laptops.

As always, for maximum intelligibility, I recommend using a pair of low-distortion headphones.

Please call if there are any questions, or if there are additional recordings to be examined or enhanced.

Sincerely,

Paul Ginsberg, President
Professional Audio Laboratories, Inc.

DEFENDANT'S
EXHIBIT
42-b

# PROFESSIONAL AUDIO LABORATORIES

### 311 Chelsea Manor
### Park Ridge, NJ 07656

PAUL GINSBERG
PRESIDENT

*www.proaudiolabs.com*

(201) 664-8333
*fax (201) 746-0695*

April 5, 2006

Mr. Robert Osuna, P.C.
11 Park Place, Suite 600
New York, NY 10007

Re:  United States v. Osman Ozsusamlar

For downloading of 111 minute recording into digital enhancement system, complete forensic examination using transient analysis, track comparison, spectrographic analysis, and audible examination to determine continuity and authenticity.      ---EXPEDITED---

Digital enhancement of conversation, and production of three digitally enhanced CD's, using specially designed speech enhancement equipment.

At the hourly lab rate of $325. for 8 hours:              $2,600.

                                        Amount Due:      $2,600.

Signed _____
        Paul Ginsberg, President
        Professional Audio Laboratories, Inc.

        Federal Employer I.D. No. 13-2821968

DEFENDANT'S
EXHIBIT
42-C

63NSOZSUSAMLAR

March 23, 06

1    THE COURT:  Off the record.

2    (Discussion off the record)

3    THE COURT:  We are ready to proceed.

4    MR. OSUNA:  First of all, I would like to thank the

5  court for allowing me to speak to my client with the

6  interpreter.  What my client believes is that there is a belief

7  on their part that the tapes have been tampered with from the

8  original to what we have been provided with and they would like

9  the court to assign us an expert to review both the originals

10  and the copies that we have for any evidence of tampering.  At

11  least that way if that were to happen our expert could then

12  testify that based on his expertise that he has found evidence

13  of tampering or else the expert can tell us in my experience I

14  find no evidence of tampering.

15    THE COURT:  That is certainly referred to in his

16  letter so I was aware of his concern.

17    What is the government's position?

18    MS. ROCAH:  Well, your Honor, obviously the

19  government's position is that, first of all, we are not talking

20  about tapes.  We are talking about CDs for the most part.

21  There are some tapes but I believe that the defendant in

22  particular referred to a CD in his letter and obviously the

23  government's position is that there has been no tampering and,

24  in fact, it really would be impossible for this CD recording to

25  be tampered with because what they are are downloads from the

any dealings with Mr. Garcia, Ms. Rocah, Mr. Southwell or any person associated with the

United States Attorney's Office?

      12.  The following persons may be called as witnesses or mentioned during the

trial:

- Dilek Batca

- Murat Batca

- Peter Brady, FBI agent

- Melvin Bailey, FBI agent

- John Campanella, FBI agent

- Michael Linder, FBI agent

- Theresa McKeever, FBI agent

- Christopher Petrellese, FBI analyst

- Mark Leper, Immigration and Customs Enforcement agent

- Louis or Louie Gomez

- Mohammad Mabrouk, a/k/a "Hesham"

- Mustafa Ozsusamlar

- Osman Ozsusamlar

- Ramazan Ozsusamlar

- Winston Lee, Esq.

      Does any juror know any of the persons listed above?  Has any juror, or any

juror's family member or close friend, had any dealings with any of the persons listed above?

      13.  The following locations may be mentioned during the trial:


DEFENDANT'S EXHIBIT
2 - Osman

# LAW OFFICE OF ROBERT OSUNA, P.C.

11 Park Place Suite 600
New York New York 10007
(212) 233 1033
Fax (212) 233 1014



Via Hand Delivery

June 2, 2006

CJA Office
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:    *United States v. Ozsusamlar, et al.  S1 05 Cr. 1077 (PLK)*

To Whom It May Concern:

My office represents Osman Ozsusamlar, a defendant in the above-mentioned matter. Judge Leisure signed an Order allowing our office to retain an expert to review audio evidence. A copy of the hat Order is annexed hereto. Enclosed please find the voucher for payment.

The payee is Professional Audio Labs Inc., 311 Chelsea Manor, Park Ridge, NJ 07646 and the TIN # is 13-2821968.

Should you have any questions, please do not hesitate to contact the undersigned.

Thank you.

Sincerely,

Law Office of Robert Osuna, P.C.
By:    Robert Osuna, Esq.



# DAVIS POLK & WARDWELL

| | | |
|---|---|---|
| 1300 I STREET, N.W.<br>WASHINGTON, D.C. 20005 | 450 LEXINGTON AVENUE<br>NEW YORK, N.Y. 10017 | MESSETURM<br>60308 FRANKFURT AM MAIN |
| 1600 EL CAMINO REAL<br>MENLO PARK, CA 94025 | 212 450 4000<br>FAX 212 450 3800 | MARQUÉS DE LA ENSENADA, 2<br>28004 MADRID |
| 99 GRESHAM STREET<br>LONDON EC2V 7NG | WRITER'S DIRECT | 1·6·1 ROPPONGI<br>MINATO-KU, TOKYO 106-6033 |
| 15, AVENUE MATIGNON<br>75008 PARIS | 212 450 4406 | 3A CHATER ROAD<br>HONG KONG |

March 23, 2007

Re:   Materials Received from Robert Osuna, Esq.

Osman Ozsusamlar
Register # 53271-054
MDC BROOKLYN
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, New York 11232

Dear Osman:

As per your request, please find two (2) boxes of documents relating to your trial that was sent to us by your former attorney, Mr. Robert Osuna. We have kept a copy of these records for our own files. I have also included empty redwelds, two legal pads and a box of highlighters for your use.

As described in Mr. Osuna's letter to me, the enclosed materials constitute your complete file in his possession, including all the exhibits, audio discs and 3500 material. The trial transcripts are not enclosed here because they were not ordered by Mr. Osuna. In addition, according to Mr. Osuna, the cassette tape for your final meeting with the undercover agent was damaged, so we will have to obtain another copy from the Government.

Please let me know if you have any questions.

Sincerely,

Tatiana R. Martins

Enclosures





# LAW OFFICE OF ROBERT OSUNA, P.C.

11 Park Place Suite 600
New York New York 10007
(212) 233 1033
Fax (212) 233 1014

March 19, 2007

Ms. Tania Martinez
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:     *United States v. Ozsusamlar et al*

Dear Ms. Martinez,                                      53271-054

     Enclosed please find the complete file for Osman Ozsusamlar including all the exhibits, audio discs and 3500 material. I have previously faxed you the documents from Mr. Ginsberg the audio expert. I do not have the trial transcripts as I was retained counsel for trial.

     These documents and audio discs were given to both Osman Ozsusamlar and at his request, an additional set was given to his brother Ramazan Ozsusamlar. The cassette tape for the final meeting between Osman and the undercover was damaged and I do not have another copy of that cassette.

     Should you have any questions, please do not hesitate to contact the undersigned.

     Thank you.

Sincerely,

Law Office of Robert Osuna, P.C.
By:    Robert Osuna, Esq.

DEFENDANT'S
EXHIBIT
19



of an expert's services entirely to one party.[110] In this case, an inmate claimed that compelled exposure to environmental tobacco smoke amounted to cruel and unusual punishment. See § 12.6, which deals with conditions of confinement as an Eighth Amendment claim. The district court was directed to a United States District Judge who could provide scientific information on health effects of environmental tobacco smoke and on concentration levels of the smoke in the prison in which the inmate was incarcerated.

## § 7.12   Retaliation for Exercising Constitutional Rights

A corrections officer warned a prisoner that if he did not become an informant, bad things would happen to him, including transfer to a less desirable part of the prison. The prisoner reported the alleged threat by a letter addressed to a United States District Judge who was presiding over pending prison litigation. As a result, the prisoner was issued a disciplinary charge for defiance. The constitutional right of access to the courts was violated by this retaliation.[112]

The necessary elements of a retaliation claim are: (1) a prison official acting under color of state law; and (2) intentional retaliation for the exercise of a constitutionally protected activity. The law is clearly established that a prison official may not retaliate against or harass an inmate for exercising the right of access to the courts.[113] Even the prison officials candidly conceded that this was a claim of constitutional proportions that is actionable. Further, the court determined that there was no immunity defense.

To state a claim of retaliation, an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive, the incident would not have occurred.[113] This places a significant burden on the inmate. Mere conclusory allegations of retaliation will not withstand a summary judgment challenge.[114] The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.

The Fifth Circuit in *Woods v. Smith* remained fully supportive of the proposition that although prison officials must have wide latitude in the control and discipline of inmates, such latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights. However, the court agreed with the Fourth Circuit when it cautioned that the prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties and that claims of retaliation must therefore be regarded with skepticism, lest the federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.[115]

Prison officials applied a policy in a way that discriminated against inmates on the basis of the content of their legal materials. The real motive of the prison officials, who prevented third-party legal materials from being delivered, was to suppress materials that embarrassed the Department of Corrections and educated inmates on how to file their claims.[116]

## § 7.13   Restrictions on Access to the Courts

A prisoner appealed an order that dismissed his *in forma pauperis* complaint as "frivolous or malicious."[117] The relief sought was considered by the court to be a "trifle" and not worthy of adjudication. A court may dismiss an *in forma pauperis* claim as frivolous if, after considering the contending equities, the court determines that the claim is: (1) of little or no weight, value, or importance; (2) not worthy of serious attention; or (3) trivial.[118]

In *Deutsch v. United States*, the allegation requested $4.20 for loss of an inmate's pens, plus litigation costs, attorney's fees, and interest. The lower court was unable to conclude that the case was legally or factually frivolous, or that it was brought for a malicious purpose, but instead determined that under the doctrine of *de minimis non curat lex*,[119] the prisoner's claim, which was limited solely to monetary damages in the amount of $4.20, was encompassed by the phrase "frivolous or malicious" as used in § 1915(d).

*Deutsch* concluded that the plain meaning of the term "frivolous" authorized the dismissal of *in forma pauperis* claims that were of little or no weight, value, or importance, not worthy of serious consideration, or trivial.

The *in forma pauperis* statute,[120] is designed to ensure that indigent litigants have meaningful access to the federal courts.[121] However, Congress also concerned that indigent persons could abuse this cost-free access to the federal courts. As a result, Congress empowered the courts with the right to dismiss the abusive filings that could result from the absence of a cost barrier by including § 1915(d), which authorizes a court to dismiss an *in forma pauperis* complaint if satisfied that the action is frivolous or malicious.

According to *Deutsch*, to find that an *in forma pauperis* litigant's claim is trivial, a court must be satisfied that the record supports a finding that a reasonable paying litigant would not have filed the same claim after considering the costs of suit. A court must first find the actual amount in controversy under the claim presented and determine whether the amount in controversy is less than the expense of the court costs and filing fees. If the court so determines, then the claim may be dismissed as frivolous under § 1915(d).

A court must next determine whether the litigant has a meaningful nonmonetary interest at stake under the claim, such that service of the complaint and an allocation of the court's resources for its adjudication is warranted, despite the fact that the claim is economically trivial. If, in addition to finding that the amount of damages in controversy is less than the



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

July 18, 2007

**BY HAND**

The Honorable Peter K. Leisure
United States District Court
Southern District of New York
500 Pearl Street, Room 1910
New York, New York 10007

      Re:  **United States v. Osman Ozsusamlar,**
             **S1 05 Cr. 1077 (PKL)**

Dear Judge Leisure:

      The Government respectfully submits this letter in
response to the submission of defendant Osman Ozsusamlar's
attorney, Franklin A. Rothman, Esq., dated June 28, 2007, further
requesting a minimal or minor role adjustment pursuant to
U.S.S.G. §3B1.2, and/or a sub-Guidelines sentence of 60 months'
imprisonment, pursuant to 18 U.S.C. § 3553(a), as well as to the
accompanying handwritten submission of Ozsusamlar ("Ozsusamlar"
in this submission refers to Osman OZsusamlar unless otherwise
noted), dated April 8, 2007, objecting to statements in the Pre-
Sentence Report ("Def. Objections").  For the reasons that
follow, Ozsusamlar is not entitled to any mitigating role
adjustment or a sentence below the applicable Guideline Range.
To the contrary, in light of the violent conduct for which
Ozsusamlar was convicted, and Ozsusamlar's outrageous conduct
since his conviction, the Court should impose a sentence above
the otherwise applicable United States Sentencing Guidelines
("U.S.S.G." or "Guidelines").  The Court should impose this
sentence based on (1) the factors set forth in Title 18, United
States Code, Section 3553(a); (2) U.S.S.G. § 3C1.1, which imposes
a sentencing enhancement for obstruction of justice; and (3)
U.S.S.G. § 5K2.0, which provides for sentencing adjustments where
facts exist that are not already adequately taken into account
by the Guidelines.

The Honorable Peter K. Leisure
July 18, 2007
Page 2

A.    **Background**

        In a submission dated October 9, 2006 ("Def. Mem. I"),
Ozsusamlar advanced essentially five arguments and issues: (1)
that U.S.S.G. § 2E1.4, applicable to the murder-for-hire counts,
is unconstitutional (Def. Mem. I at 4-5); (2) that two
enhancements to the extortion group are incorrect (Def. Mem. I at
4); (3) that Ozsusamlar is entitled to a minimal role reduction
in his offense level (Def. Mem. I at 5-8); (4) that Ozsusamlar is
entitled to a reduced offense level due to "imperfect entrapment"
(Def. Mem. I at 8-9); and (5) that under the Section 3553(a)
factors, Osman Ozsusamlar should be sentenced to 60 months'
imprisonment (Def. Mem. I at 9-12).  Ozsusamlar also argued that
the grouping analysis in the PSR is incorrect.  (Def. Mem. I at
3-4).

        The Government responded to those arguments in a
submission dated November 1, 2006 ("Gov't Br."), in which the
Government took issue with each of the defendant's arguments,
except that it agreed that all of the counts of conviction should
be grouped, resulting in an offense level of 32, with an
applicable Guidelines Range of 121-151 months' imprisonment.  At
the time of that submission, the Government stated that the
applicable Guideline Range provided for a reasonable and
appropriate sentence, in light of all of the Section 3553(a)
factors.  (Gov't Br. at 9).

        In a letter dated June 28, 2007, Ozsusamlar's most
recent counsel[1] essentially reiterates the same arguments that he
previously made regarding why he is entitled to a mitigating role
adjustment and/or why he is entitled to a sentence of 60 months'
imprisonment -- less than half the bottom of the applicable
Guidelines range -- pursuant to the Section 3553(a) factors.  The
Government will not repeat all of the arguments set forth in its
previous submission detailing why these arguments were and are
completely meritless.  (*See* Gov't Br. at 13 -20).

        In addition, the Government sets forth below a summary
of certain evidence which has come to light since the
Government's last submission, which it intends to prove at a
hearing pursuant to *United States* v. *Fatico*, 579 F.2d 707 (2d
Cir. 1978), which strongly supports an upward adjustment in

---

        [1]    At a conference on July 16, 2007, Ozsusamlar elected to
represent himself *pro se* with Mr. Rothman as "standby" counsel.

The Honorable Peter K. Leisure
July 18, 2007
Page 3

Ozsusamlar's sentence.  Specifically, the Government seeks an
increase in Ozsusamlar's sentence above the Sentencing Guideline
Range calculated in the Pre-Sentence Report ("PSR"), based on (1)
an upward departure for circumstances of a kind not adequately
taken into consideration by the guidelines, pursuant to U.S.S.G.
§5K2.0 (a)(2)(B); (2) an enhancement for obstructing and impeding
the administration of justice, pursuant to U.S.S.G. § 3C1.1; and
(3) pursuant to the factors in Title 18, United States Code,
Section 3553(a).

        The Government intends to introduce evidence at the
*Fatico* hearing through the testimony of one witness, FBI Special
Agent Christopher McKeogh.  Agent McKeogh's testimony will show
that within the past four months:  (1) Ozsusamlar solicited
another inmate at the MDC -- who Ozsusamlar believed was soon to
be released -- to collect an extortionate loan from the Batcas
(the same extortionate loan for which Ozsusamlar was convicted at
trial); (2) Ozsusamlar solicited the same MDC inmate to find and
kill several people who had participated in the investigation and
prosecution of Ozsusamlar and his father, including several FBI
agents, Assistant United States Attorneys ("AUSAs"), and other
court personnel; (3) Ozsusamlar took steps to have other
individuals, outside of jail, investigate Ozsusamlar's targets --
including various FBI agents and AUSAs -- and to gather personal
information about those individuals, including home addresses,
family members, and photographs; and (4) Ozsusamlar communicated
threats against the Court and the Government in writing directly
to this Court and to others.

        In addition, through Special Agent McKeogh, the
Government intends to offer seven exhibits, which are primarily
documents written by Ozsusamlar himself within the past four
months.  These documents reveal Ozsusamlar's plan to seek revenge
on the AUSAs and FBI Agents who prosecuted him and his attempts
to continue with the extortionate attempts to collect money from
the Batcas.  (Copies of these documents are attached to this
letter as Exhibits 1-7).[2]

---

        [2]    The Government expects to introduce testimony from
Special Agent McKeogh about how the FBI obtained each of these
documents.  That testimony will likely include limited hearsay
testimony; specifically, Special Agent McKeogh will testify about
statements made by a fellow MDC inmate of Ozsusamlar's about the
creation of approximately two of the seven attached documents.
Such hearsay testimony is, of course, admissible at sentencing.

May 7, 2007

Rothman, Schneider
Soloway & Stern, LLP
100 Lafayette St suite 501.
New York, NY 10003

Judge Peter K. LEISURE
USDC — SDNY
500 Pearl St Room 1910
New York, NY 1000.7

Re: USA v. OZSUSAMLAR
S1. 05. Cr. 1077 (PKL)

Dear Mr. Soloway and Judge Leisure,

On May 3, 2006 and August 9, 2006 thi
Honorable Court did advized me to ~~get~~ not sent to
Court any more letters. My letters are the only th
gatting to truth.

I make all my arrangement to get informatior
on my own. I tell you again this example.

At Court last week I give my Attorney my
motion and objection to my PSR. It very detailed writte
many pages. This week, Attorney mail me an old cop,
of the PSR and tell me to respond to him very soon.
if there are any mistakes in PSR. It's dated After we
met in Court! That very stupid and lazy.

I still not have my 3500 material for informatior
up to December, 30, 2006. Judge Leisure order the
forensic report that Osuna not get. It clear to me
Judge Leisure get money from Osuna to keep me
here in prison.

I not write any more. It not doing any good —

My appeal come back, I get honest people then. I have friends now who are going to get information an all of you and get even for me. May 13 is comming soon.

Sincerely.

cc: File
: AUSA Ms. Rocha.

Osman Ozsusamlar
#53271-054
MDC-Brooklyn
P.O. Box 329002
Brooklyn, NY 11232

Page ② of ②

P-S308.052  **ADMINISTRATIVE DETENTION ORDER**  CDFRMMAY 94

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

                                        MDC, BROOKLYN, NEW YORK
                                        Institution

                                        MAY 09, 2007/ 7:00 P.M.
                                        Date/Time

TO      : Special Housing Unit Officer

FROM    : R. PASLEY, JR., Lieutenant  , (Name/Title)              Unit: B-A

SUBJECT : Placement of OZSUSAMLAR, OSMAN Reg. No 53271-054 in Administrative Detention

_____  (a)  Is pending a hearing for a violation of Bureau regulations;

___XX___  (b)  Is pending investigation of a violation of Bureau regulations;

_____  ©)  Is pending investigation or trial for a criminal act;

_____  (d)  Is to be admitted to Administrative Detention

              _____  (1) Since the inmate has requested admission for protection;

        I hereby request placement in Administrative Detention for my own protection.

              Inmate Signature/Register No.: _____

              Staff Witness Printed Name Signature: _____

              _____  (2) Since a serious threat exists to individual's safety as perceived by
staff, although person has not requested admission; referral of the necessary information
will be forwarded to the UDC/DHO for appropriate hearing.

_____  (e)  Is pending transfer or is in holdover status during transfer.

_____  (f)  Is pending classification; or

_____  (g)  Is terminating confinement in Disciplinary Segregation and has been ordered
into Administrative Detention by the Warden's designee.

It is this officer's decision based on all the circumstances that the above named inmate's
continued presence in the general population poses a serious threat to life, property,
self, staff, other inmates, or to the security or orderly running of the institution
because*

You have been placed in administrative detention for pending an SIS for code 203 threatening
another with bodily harm or any other offense. This type of behavior will not be tolerated
in the institution.

The inmate received a copy of this Order on (date / time) 05-09-2007/ 7:00 P.M.

Staff Witness Signature/Printed Name A. Ambroise, C.O./A. Ambroise Date 05-09-2007

*In the case of DO action, reference to that order is sufficient.  In other cases, the
officer will make an independent review and decision, which is documented here.
Record Copy - Captain;
Copy - Inmate Concerned; Copy - Administrative Detention Unit; Copy - Unit Manager;
Copy - Special Investigative Supervisor
(This form may be replicated via WP)                    Replaces BP-308(52) of JAN 88

**DISCIPLINE HEARING OFFICER REPORT**
U.S. DEPARTMENT OF JUSTICE

**BP-S305.052 MAY 94**
FEDERAL BUREAU OF PRISONS

| INSTITUTION | MDC Brooklyn | INCIDENT REPORT NUMBER | | 1601577 |
|---|---|---|---|---|
| INMATE NAME | Ozsusamlar, O | REG NO. 53271-054 | UNIT | B |
| DATE OF INCIDENT | 5/9/07 | DATE OF INCIDENT REPORT | | 5/22/07 |

| OFFENSE CODE(S) | 203 |
|---|---|

| SUMMARY OF CHARGES | Threatening Another with bodily Harm |
|---|---|

**I.   NOTICE OF CHARGE(S)**

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) 5/22/07     at     2:10pm     (by staff member) Munoz

B. The DHO Hearing was held on (date)     5/31/07     at (time)   10:10am

C. The inmate was advised of his/her rights before the DHO by (staff member): Facey, Case Manager     on (date)   5/24/07     and a copy of the advisement of rights form is attached.

**II.   STAFF REPRESENTATIVE**

| A. Inmate waived right to staff representative. | Yes: | x | No: | |
|---|---|---|---|---|

B. Inmate requested staff representative and   N/A     appeared.

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that:   N/A.

| D. Staff representative | N/A | was appointed. |
|---|---|---|

E. Staff representative statement:

I reviewed the incident report packet.

**III.   PRESENTATION OF EVIDENCE**

| A. Inmate admits | | denies | x | the charge(s). |
|---|---|---|---|---|

B. Summary of inmate statement:

I have never had a problem with staff or inmates. The letter went to the judge. Yes this is my hand writing and signature. It also went to the attorney. I lost everything and was having problems. My friend went to get the transcript from the court. I never threatened anybody. Somebody else wrote it for me. My English is not that good. Somebody helped me but I do not remember who helped me.

C. Witness(es):

| 1. The inmate requested witness(es). | Yes: | | No: | x |
|---|---|---|---|---|

2. The following persons were called as witnesses at this hearing and appeared. (Include each witnesses' name, title, reg number and statement as appropriate.)

N/A

3. The following persons requested were not called for the reason(s) given.

# DISCIPLINE HEARING OFFICER REPORT
## U.S. DEPARTMENT OF JUSTICE

**BP-S305.052 MAY 94**
**FEDERAL BUREAU OF PRISONS**

| N/A | | | | | | |
|---|---|---|---|---|---|---|
| 4. Unavailable witnesses were requested to submit written | Yes | | No | | N/A | X |

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:

Copy of handwritten letter addressed to Mr. Soloway and Judge Leisure dated 5/7/07 and signed by Osman Ozsusamalar #53271-054

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate.  The confidential information was documented in a separate report.  The confidential information has been (confidential informants have been) determined to be reliable because:

N/A

## IV. FINDINGS OF THE DHO

| X | A. The act was committed as charged. | |
|---|---|---|
| | B. The following act was committed: | |
| | C. No prohibited act was committed: Expunge according to Inmate Discipline PS. | |

## V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.)

Your due process rights were read and reviewed with you by the DHO at the time of the hearing.  You stated you understood your rights, had no documentary evidence to present and requested no witnesses.  You also did not request the service of a staff representative. You then indicated that you were ready to proceed with your DHO Hearing.

The DHO finds that you committed the prohibited act of Code 203, Threatening Another with bodily harm.  The finding is based on the written statement of the reporting officer that it was concluded on 5/22/07 that you threatened another person.  Specifically, on 5/9/07, you addressed a letter to Judge Peter K. Leisure. IN the letter you made the following statements; I not write any more it not doing good.  My appeal come back.  I get honest people then.  I have friends now who are going to get information on all of you and get even for me.  May 13 is coming soon.  A copy of the hand written letter was also relied upon.

During the hearing you stated, I have never had a problem with staff or inmates.  The letter went to the judge.  Yes this is my hand writing and signature.  It also went to the attorney.  I lost everything and was having problems.  My friend went to get the transcript from the court.  I never threatened anybody.  Somebody else wrote it for me.  My English is not that good.  Somebody helped me but I do not remember who helped me.

Based on the reporting officer statement that it was concluded on 5/22/07 that you threatened another person.  Specifically, on 5/9/07, you addressed a letter to Judge Peter K. Leisure. IN the letter you made the following statements; I not write any more it not doing good.  My appeal come back.  I get honest  people then.  I have friends now who are going to get information on all of you and get even for me.  May 13 is coming soon.  A copy of the hand written letter was also relied upon. Although you admit to sending the letter but deny threatening anyone,  the DHO considered the greater weight of the evidence and finds you committed the prohibitive act of Code 203, Threatening Another with bodily harm.

## VI. SANCTION OR ACTION TAKEN

Code 203
30 days disciplinary segregation (release 6/29/07)
175 days loss visits (5/31/07-11/21/07)

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

---

175 days loss phones (5/31/07-11/21/07)
175 days loss commissary (suspended pending 180 days clear conduct)
27 days loss GCT (disallow when available)

## VII. REASON FOR SANCTION OR ACTION TAKEN

Threatening another with bodily harm as documented in this report will not be tolerated because it can result in violent confrontations which may lead to injuries to staff and inmates.   This type of behavior is unacceptable and cannot be tolerated because it undermines the authority of staff and demonstrates a disregard for rules and regulations. This type of behavior disrupt the orderly operation of the institution by impeding staff's ability to perform their assigned duties, and if allowed to continue uncorrected, tends to encourage other inmates to participate in the same type of behavior.

You have been sanctioned to 30 days DS,   27 GCT, 175 days loss of visits, phones, and commissary (susp) to punish you for committing the prohibitive act code 203.    To specifically address the DS time and loss of privileges, as DHO I have determined these sanctions to be warranted.   These sanctions in the past have proven very effective in having individuals modify their behavior to acceptable standards.   These sanctions have been imposed to deter you from future negative behavior and to again remind you that you are to abide by the rules and regulations of this institution and any BOP facility.

## VIII. APPEAL RIGHTS: The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action.   The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

|  | Yes | X | No |  |  |
|---|---|---|---|---|---|

## IX. DISCIPLINE HEARING OFFICER

| Printed Name of DHO | Signature of DHO | | Date |
|---|---|---|---|
| D. Garcia | | | 5/31/07 |
| Report delivered to inmate by: | DATE | | TIME |

(This form may be duplicated in WP)

Replaces BP-304(52) of JAN 88

Delivered via Institutional Mail_____

APR-13-2007  15:15        FEDERAL DEFENDER

Osman, we need to be clear. There will be no communication from this. Write up exact description of the Park you want to put down.

| FBI Agent |
John F Campanella. SSA.       5'8" stocky stout Bald
Melvin F Bailey.
Theresa McKeever.
Christopher Petreseller.
Michael Linder.

Agent

AUSA
Miriam Rocha
Alexander Southwell

Case Court Reporter   Office

Forensic test Company

Lawyer
Joyce London
Robert Osuna
Ihsan Askin,
201-8736257.

Botca's   Man check parking - Paterson, NJ   July 05
Difek - 35 $ rental.
Murat - 35.

Sibigs   2 brothers - 1 sister
One other other in Pa

$150,000 of Loan   $32 per year Concord standby
$500,00 Cash Loan Balance

1/3 days.

(1)

- 3500.
- forensic.

(1) murder for hire          conspiracy.

(2)

(3) extion.

2007
2001
?
© 108.          6

Muhamed  → SSA John Comperalo
See

Kill    SA Agen Melvin Bailey ←

SA Mc Keever  →  White Crime  SA → 12
Linder.                                Queens.

(1) Manhattan
(2) Murder.  Sg 20.
(3)

Paterson  NJ.        Paterson  NJ

751GOZSC

1    defendant, what comes shining through in my discussions with

2    him, it's his feeling that the tapes that were made in

3    connection with this case that were part of the damning

4    testimony at trial, that those tapes are not authentic.  His

5    concern is that your Honor had signed an order directing that

6    an analysis be done by an appropriate expert to determine

7    whether or not, in fact, the government tapes that were

8    supplied were authentic or had been somehow doctored, and what

9    concerns this defendant is that he has never seen or read

10   anything about a written report prepared by that expert.

11            I spoke to trial counsel, Mr. Osuna, last week, and I

12   spoke to Mr. Paul Ginsberg from Pro Audio Labs, which is the

13   laboratory that conducted their investigation and analysis of

14   the tapes that were played during trial.  Mr. Ginsberg has

15   advised me that he will have a written report for me within the

16   next two weeks discussing the veracity, or lack thereof if that

17   should be the findings, of these tapes.  And I've assured the

18   defendant that once I receive that written report, I will

19   forward it to him so that hopefully that will put that issue to

20   rest.

21            He has asked --

22            THE COURT:  Have you had a chance to talk to

23   government counsel about this prior to the proceedings today?

24            MR. ROTHMAN:  Yeah.  We spoke before we appeared

25   before your Honor.

751GOZSC

1  that he has a full right of appeal on any issues that he wishes

2  you to raise, but as far as further investigation or hearings

3  with respect to the trial, that has already been conducted.

4           I'll have to hear from the government, but, of course,

5  the government will give you what their position would be in

6  front of me based on their experience.  And we're not in a

7  position of educating the defendant of the procedures in

8  criminal cases, because matters have happened and occurred, and

9  we are where we are.  And the case is not going to be reopened

10  for investigations and hearings.  So you'll have to explain

11  that to him.

12           MR. ROTHMAN:  We've discussed it, and I've tried to

13  make it clear to this defendant that the issues that he is

14  raising, whether or not his attorney was ineffective at trial,

15  didn't raise things that should have been raised, didn't bring

16  up authenticity issues with respect to the tapes, that those

17  are appellate issues, that the next step in order to get to

18  those issues would be to have him sentenced.  And I think he's

19  grasping that and understands that.

20           However, he wants me to note on the record for your

21  Honor his objections to prior counsel and his feelings that

22  trial counsel was wholly ineffective for a number of reasons,

23  including the reasons I've placed on the record, namely, that

24  no forensic report was ever prepared, despite the fact that

25  your Honor signed an order authorizing a report to be prepared

751GOZSC

1    by an audio technician.  And I've advised the defendant that I

2    would place this on the record so that he understands these

3    issues are, in fact, preserved, should they become an issue for

4    appellate purposes, that he would absolutely be allowed to

5    raise them.

6              He wanted me to ask your Honor if he could be

7    transferred to MCC as opposed to MDC, because he sleeps better

8    at MCC.  He's more alert and more aware of the proceedings when

9    he's well rested.

10             THE COURT:  Is that something government counsel has

11   been advised of --

12             MR. ROTHMAN:  Yes.

13             THE COURT:  -- and considered?

14             MR. ROTHMAN:  I told them today.

15             THE COURT:  Oh, today?

16             MR. ROTHMAN:  Yes, just today.

17             MR. SOUTHWELL:  And that was in some of the pro se

18   papers, your Honor.  We take no position on that.  Obviously,

19   that's something for the Bureau of Prisons to deal with, and I

20   think it's not appropriate of a request for judicial

21   interference with whatever the marshals and the Bureau of

22   Prisons have to deal with.

23             THE COURT:  Now, unfortunately he was talking to his

24   attorney while you were speaking.  So I'll ask you to repeat

25   that.

751GOZSC

*may 1, 2007*

1    find out in the days ahead.

2              THE COURT:  And you'll discuss it with the government

3    counsel?

4              MR. ROTHMAN:  If there's anything that this defendant

5    is missing that he should have, then certainly he will get it

6    from me.  I believe those are his concerns for today.

7              THE COURT:  Well, of course it's very important for

8    the government to be sure that he receive the 3500 material

9    and, if not, that it will be made available to him.

10             MR. SOUTHWELL:  Of course it will.  I mean, it has

11   already, just to be clear, to his attorneys long ago, but if

12   there's any particular piece that he's missing, we can

13   certainly provide another copy.

14             THE COURT:  Very good.  Well, we'll move ahead.

15             What I said at the outset here today is important, and

16   that is that we have to move ahead so that even though 60 days

17   is a longer period than I would have given, out of respect for

18   defense counsel, to be sure that they can fully discuss these

19   matters with the defendant, it seems like it's a reasonable

20   time.

21             Does the government wish to indicate more specifically

22   dates for submission of amended sentencing reports from both

23   sides within that 60-day period?  I think we should move with

24   specific dates to accomplish matters.

25             MR. SOUTHWELL:  Sure.  Your Honor, what I would

The stereo waveform was consistent with that of a recording made using two microphones reasonable close to one another. The left and right channels tracked each other substantially, the left slightly higher than the right, indicating that it probably was a little closer to the conversation from the way that recorder was positioned.

There was no evidence or any discontinuities.

Following examination, after some experimentation to maximize intelligibility, a digitally enhanced file was generated. Three digitally enhanced CD's were then produced.

## I. <u>SUMMARY OF OBSERVATIONS</u>

1. The recording was made using an Eagle 4-A digital recorder.

2. The recording is a two-channel recording.

3. The duration of the recording is 111 minutes 8 seconds

4. Time of recording was 7/18/05 from 18:55:17 to 20:46:25.

5. The time/date signal, generated at the time of recording, is continuous for the duration of the recording.

6. There is no evidence of any manipulation, erasure, over-recording or editing.

## J. <u>CONCLUSIONS</u>

Based upon the observations above, it is my opinion that the recording is continuous and reliable, and that it accurately represents the conversation at the time of recording.

Signed _____        Dated ___4-29-07___

Paul Ginsberg, President
Professional Audio Laboratories, Inc.



## ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN
JEREMY SCHNEIDER
ROBERT A. SOLOWAY
DAVID STERN

Tel: (212) 571-5500
Fax: (212) 571-5507

May 10, 2007

Mr. Osman Nuri Ozsusamlar
Reg # 53271-054
Metropolitan Detention Center
100 29th Street
Brooklyn, New York 11232

            Re:  USA v. Osman Ozsusamlar
                 05 Cr. 1077 (DLC)
                              (PKL)

Dear Osman:

     Enclosed please find a copy of the report showing the
results of the forensic examination of the tape recorded evidence
in your case. Please feel free to call with any questions.

                              Sincerely,

                              Franklin A. Rothman

FAR/et
Encl.

# Report on Tape-Recorded Evidence

## United States v. Osman Ozsusamlar

## Prepared by

## Paul Ginsberg, President
## Professional Audio Laboratories, Inc

## INTRODUCTION

Professional Audio Laboratories specializes in the enhancement, forensic examination, and presentation of audio and video taped evidentiary material. The company has been in existence for 33 years with Paul Ginsberg as its president.

During the past 33 years Professional Audio Laboratories has analyzed, enhanced and supervised the courtroom presentation of thousands of taped conversations including telephone calls, consensual meetings, video-taped meetings, as well as room bugs and body recordings recorded in various formats including Nagra, KEL, cassette, micro-cassette, reel, and others designed for law enforcement surveillance.

We have been court-qualified as expert, and have rendered expert testimony on 170 occasions in 27 Federal districts as well as in Canada. We have testified for prosecution, as well as defense.

## THE EXAMINATION

The examination of tape-recorded evidence consists of the following:

     a) The Physical Inspection

     b) The Aural Inspection, or Critical Review

     c) The Electronic Inspection

Each of these procedures yields information, which, when combined, provides a complete picture of events observed on the subject tapes.

## A. THE PHYSICAL INSPECTION

The physical inspection consists of an examination of the subject tape or tapes in order to determine whether there has been any physical tampering or alteration of the tape or housing. In the case of a cassette or micro-cassette the physical housing is examined to ascertain whether it has been opened and reclosed. The tape itself is examined to determine glossiness, thickness, color, and dimensions, and is then compared to a factory fresh tape of the identical type.

The end leader tapes are examined to determine whether or not they are in their original condition. Also, the tape is timed on a calibrated recorder to test for missing or added tape. Also the tape is advanced slowly through its entire length to search for splices.

A magnetic developing solution is employed to ascertain track recording configuration of the recorder used in recording the tape.

## B.  THE AURAL EXAMINATION

During the aural examination a critical listening and review is performed on all tracks on both sides of a subject tape so as to identify areas of discontinuities, over-recordings, erasures, stops and starts, and other areas of interest.

Use is made of low-distortion playback-only machines and low-distortion headphones so that a true picture of the tape can be realized.

Speed variations are noted, as well as changes in the acoustic character of the background during conversations. Also hum and noise are noted, and are used to track continuity, if present.

During this phase of the examination notes are made as to the times of significant events, such as beginnings and endings of conversations when multiple conversations are recorded, as in the case of a wiretap tape.

In the case of a tape recorded on a stereo machine, measurements are made for each channel, and compared so as to determine operation of the microphones, and machine during recording. Also the two channels are valuable in providing additional information as to continuity of the subject recording.

## C.  THE ELECTRONIC EXAMINATION

The final part of the investigation is the electronic examination. This is performed using several specialized pieces of laboratory equipment. Observations are made from a spectrum analyzer, a digital waveform storage oscilloscope, and a computer using sophisticated speech analysis software. Additionally noise measurements are made at various points of a subject tape to

determine whether there are erasures or over-recordings. Using the various instruments one can draw conclusions as to type of recorder used to make a recording as well as identify starts, stops, over-recordings and other events observed on a subject tape. Hum recorded simultaneously with conversation, as in the case of a telephone induction coil pickup, can be checked for continuity thus demonstrating that the subject conversation was continuous as well.

## D.   MATERIALS RECEIVED FOR EXAMINATION

A CD containing an audio file was received for forensic analysis from attornrey Rober Osuna.

## E.   PHYSICAL EXAMINATION – SUBJECT TAPES

The CD appeared to be intact with no signs of damage or tampering.

## F.   CRITICAL LISTENING AND REVIEW

The CD was inserted into a computer analysis and digital enhancement system for review. It contained what was recognized as a file of a recording made on a digital recorder in a proprietary format, along with a software player file, allowing playback of the recorded file.

The display on the screen was:

"Eagle 4A S/R 11.025 KHz.   9/18/05  18:55:17  20:46:25   111 min 08 sec"

The file was played using the supplied player. It was observed to be a two-channel stereo recorded segment of duration 111 minutes 8 seconds.

## G.   DISCUSSION OF RECORDING TYPE

The Eagle recorder is one of a family of recorders designed for law enforcement. It is a small self-contained unit that can record continuously for a number of hours in mono single channel, or stereo two-channel. It records digitally and uses no tape. The signal is picked up by miniature internal microphones, and is stored in its flash memory.

Several features are built in to the unit to insure integrity of the recordings made using the device. First, the unit stores recorded information in a proprietary file format. This means that the file cannot be played, or edited using a standard sound editing software program, unlike a WAV or MP3 file.

In fact, the only way to play an Eagle file is to use the manufacturer's supplied player software. It allows only playing of the entire file, stopping, starting, rewind and fast-forward.

Also, there is an internal clock in the recorder that generates a real-time date and time signal that is interwoven into the recorded file. During playback using a PC or laptop computer, this time signal can be observed to be incrementing, displaying the exact date and time of the recording, changing as the recording plays back.

The recorder has two controls, "start" and "stop". While recording, if the recorder is stopped, the file ends. When the recorder is turned on again subsequently, the recorder generates a new file. It does not append to an existing file.

The result is that, during playback, if one observes a file recorded on an Eagle recorder, that recording represents one continuous recording.

## H.   ELECTRONIC EXAMINATION AND ENHANCEMENT
##        SUBJECT RECORDING

The file was downloaded into a forensic examination system. It was observed to be a stereo file of duration 111 minutes 8 seconds.

The stereo waveform of the file was reviewed, along with a spectrogram picture of the frequencies present in the recording. See waveform and spectrogram plots attached.

The machine display "S/R 11.025 kHz" means that a digital sampling rate of 11,025 cycles per second  was used in order to change the sound into a digital form for storage. This allows an upper frequency of approximately 5,500 cycles per second.

The observed frequency spectrogram was consistent with a recording made using these parameters.

The stereo waveform was consistent with that of a recording made using two microphones reasonable close to one another. The left and right channels tracked each other substantially, the left slightly higher than the right, indicating that it probably was a little closer to the conversation from the way that recorder was positioned.

There was no evidence or any discontinuities.

Following examination, after some experimentation to maximize intelligibility, a digitally enhanced file was generated. Three digitally enhanced CD's were then produced.

## I.   SUMMARY OF OBSERVATIONS

1. The recording was made using an Eagle 4-A digital recorder.

2. The recording is a two-channel recording.

3. The duration of the recording is 111 minutes 8 seconds

4. Time of recording was 7/18/05 from 18:55:17 to 20:46:25.

5. The time/date signal, generated at the time of recording, is continuous for the duration of the recording.

6. There is no evidence of any manipulation, erasure, over-recording or editing.

## J.   CONCLUSIONS

Based upon the observations above, it is my opinion that the recording is continuous and reliable, and that it accurately represents the conversation at the time of recording.

Signed _____          Dated ___4-9-07_____

Paul Ginsberg, President
Professional Audio Laboratories, Inc.